**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MAUREEN E. CARNEY | : | |
| Plaintiff, | : | |
| | : | 3:16-cv-00592 (VLB) |
| v. | : | |
| | : | September 20, 2018 |
| ALLSTATE INSURANCE COMPANY | : | |
| Defendant. | : | |

**MEMORANDUM OF DECISION GRANTING ALLSTATE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 36]**

I.   **Introduction**

This case concerns a contract dispute over an insurance policy and whether it covers damage to the basement walls of Plaintiff's home caused by defective concrete.  Plaintiff alleges breach of contract (Count I) and violations of the Connecticut Unfair Insurance Practices Act ("CUIPA") and Unfair Trade Practices Act ("CUTPA") (Count III) stemming from Defendant's decision to decline coverage for the damage under Plaintiff's insurance policy.[1]  Defendant now moves for summary judgment as to Counts I and III of Plaintiff's Amended Complaint.  For the reasons that follow, Allstate's Motion for Summary Judgment, Dkt. 36, is GRANTED.

_____

[1] Plaintiff's Complaint also included a claim for breach of the implied covenant of good faith and fair dealing as Count II, which this Court dismissed for failure to state a claim under Rule 12(b)(6) on February 14, 2017.  Dkt. 34.

## II.    Factual Background and Procedural History

Plaintiff purchased the property located at 18 Deer Meadow, Tolland, Connecticut (the "Property") in 2003.  Dkt. 19 (Am. Compl.) ¶ 3.  The Property was built in 1998.  *Id.*  Allstate "insured the Property under separate policies of insurance [(the "Policy")], each with one year terms, since July 11, 2003, and continuing through to the present."  Dkt. 36-2 (Def.'s Stmt. Undisputed Material Facts ("SUMF")) ¶¶ 4, 5.

The Policy specifies under "Losses We Cover Under Coverages A and B," that it covers "sudden and accidental direct physical loss to property . . . except as limited or excluded in this policy."  Dkt. 36-4 (Mot. Summ. J. Ex. A., Ex. 1 (Policy)) at 5-6.  Under exclusions, the Policy specifies that it does not cover, *inter alia*, "15. . . . (d) rust or other corrosion, mold, wet or dry rot; . . . (g) settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings" and/or "22. Planning, Construction or Maintenance, meaning faulty, inadequate or defective: . . . (b) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction; (c) materials used in repair, construction, renovation or remodeling; or (d) maintenance; of property whether on or off the residence premises by any person or organization."  *Id.* at 7-8.  Additionally, it states that it does not cover "[c]ollapse, except as specifically provided in Section I — Additional Protection."  *Id.* at 7.

"Section I — Additional Protection" specifies that the Policy "will cover (a) the entire collapse of a covered building structure" and "(b) the entire collapse of part of a covered building structure" when that collapse is "a sudden and

accidental direct physical loss caused by . . . hidden decay of the building structure . . . [or] defective methods or materials used in construction, repair, remodeling or renovation." *Id.* at 15. Finally, the Policy states that "[c]ollapse does not include settling, cracking, shrinking, bulging or expansion." *Id.* The Allstate Policy does not contain a specific definition for "collapse," but defines "building structure" as "a structure with walls and a roof." *Id.* at 3.

In July of 2015, Plaintiff observed "some hairline cracking" in a porch at the front of the Property. Dkt. 36-2, at ¶ 13. A month later, in August of 2015, Plaintiff noticed a "more significant pattern of horizontal and vertical cracks" throughout the basement walls of the Property. Dkt. 37 (Pl.'s Opp'n), at 1-2; Dkt. 36-2, at ¶ 14. Plaintiff's builder told her that the concrete at issue had been supplied by the J.J. Mottes Company and Plaintiff proceeded to procure an engineer to investigate the condition. Dkt. 37, at 2. Plaintiff's engineer conducted a visual inspection, observing the pattern of cracking and bowing of the walls in several locations, and reported that he believed that the cracking was "was caused by an Alkali-Silica-Reaction and that the walls would continue to deteriorate over time." *Id.* The engineer further concluded "that the walls were structurally unsound at the time of his inspection and that corrective action was necessary." *Id.* at 2-3.

Plaintiff filed a claim with Defendant in August or September of 2015. *Id.* at 3; Dkt. 36-2, at ¶ 5. Defendant's experts inspected the condition of the concrete and concluded that it was "the result of long-term progressive deterioration of the foundation walls as the result of pyrrhotite, a reaction iron sulfide contained in the concrete aggregate since it was first poured." Dkt. 36-2 ¶¶ 16-18. Following the investigation, Defendant denied the claim by letter dated February 8, 2016. Dkt.

36-2, at ¶ 6; Dkt. 36-5 (Mot. Summ. J. Ex. B, Ex. 1 (Denial Letter)).  The letter stated:

> Your claimed loss involved cracking to the concrete in your foundation.  Allstate's investigation has determined that the cracking is likely the result of the effect of water and air on pyrrhotite in the aggregate in the foundational concrete that has been present since the foundation was poured.  The cracking is a condition that has progressed over an extended period of time.

Dkt. 36-5, at 2.  It further explained that one or more exclusions applied to the claimed loss because "the foundation cracking at the Property is not 'sudden and accidental direct physical loss'" but instead has "progressed gradually over the years" and "[t]he Property did not collapse, within the scope of [the Policy]."  *Id.* at 1-3.

Based on inspection, the parties' experts in this case agree "that the conditions they observed in Plaintiff's foundation walls are the result of long-term deterioration" and "that the oxidation of the reaction materials, which is triggered by exposure to air and water, occurs over an extended period of time, not suddenly," Dkt. 36-2, at ¶¶ 19-20; Dkt. 38 (Pl.'s Resp. Def.'s SUMF), at ¶¶ 19-20, with Plaintiff's expert further specifying that "the cracking condition is the result of numerous sudden events."  Dkt. 38, at ¶¶ 20.  The Property's basement walls are still standing and continue to support the house above.  Dkt. 36-2, at ¶ 23.  The Property continues to be safe for use as a home.  *Id.* at ¶ 25; Dkt. 38, at ¶ 25.

### III.    Standard of Review

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse*, 611 F.3d 98,

106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Property Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted). In addition, the court should not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "these determinations are within the sole province of the jury." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in [her] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.' At the summary judgment stage of the proceeding, [p]laintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (quoting *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996). "Summary judgment cannot be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

## IV. <u>Discussion</u>

As many courts before have done, this Court now considers whether the concrete decay condition afflicting Plaintiff's basement walls is covered by the Policy. Dkt. 36-1, at 3; Dkt. 37, at 6. Because there is no genuine issue of material fact and the relevant Policy language unambiguously denies coverage for Plaintiff's claimed loss, this Court GRANTS Defendant's Motion for Summary Judgment as to Counts I and III.

### A. <u>Count I: Breach of Contract</u>

An insurance policy "is to be interpreted by the same general rules that govern the construction of any written contract." *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 372–73 (2008). Any contract "must be construed to effectuate the intent of the parties, which is determined from the language used and interpreted in the light of the situation of the parties and the circumstances connected with the transaction." *Murtha v. City of Hartford*, 303 Conn. 1, 7–8 (2011) (quoting Remillard v. Remillard, 297 Conn. 345, 355 (2010)); *Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn. 254, 260 (2011) ("In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction." (quotations omitted)).

Where the language of a contract is unambiguous, a court "must give the contract effect according to its terms." *Harbour Pointe*, 300 Conn. at 260 (quoting *Cantonbury Heights Condominium Ass'n Inc. v. Local Land Dev., LLC*, 273 Conn. 724, 734–35 (2005)). A contract is unambiguous when "its language is clear and

conveys a definite and precise intent . . . .  The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." *Id.* "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Id.*

Where the language of an insurance policy is ambiguous, such language must be construed against the insurance company that drafted the policy.  *See Springdale Donuts, Inc. v. Aetna Cas. & Sur. Co.*, 247 Conn. 801, 806 (1999). However, any ambiguity in a contract "must emanate from the language used by the parties" and "a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself."  *Murtha*, 300 Conn. at 9. "The contract must be viewed in its entirety, with each provision read in light of the other provisions ... and every provision must be given effect if it is possible to do so . . . .  If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous."  *Harbour Pointe*, 300 Conn. at 261 (quoting *Cantonbury Heights*, 273 Conn. at 735).  "Whether a contract is unambiguous is a question of law for the Court, appropriately decided at the summary judgment stage."  *Lees v. Allstate* No. 3:15-cv-1050, 2017 U.S. Dist. LEXIS 196728, at *14-17 (D. Conn. Nov. 30, 2017) (citing *Continental Ins. Co. v. Atlantic Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010)).

Defendant argues that the "plain and unambiguous" language of the Policy does not cover Plaintiff's claimed loss.  Dkt. 36-1, at 10.  In particular, Defendant argues that Plaintiff's claim is not covered because (1) it is not a "sudden and accidental direct physical loss" as required by the Policy, and even if it were, loss

7

consisting of or caused by cracking of walls or rust or corrosion and loss caused

by defective materials used in construction are excluded from coverage and (2)

the additional coverage for collapse requires a "sudden and accidental" "entire

collapse," which did not occur in this case, and specifically excludes the

shrinking, cracking, and bulging that has occurred in this case. *Id.* at 3.

Plaintiff concentrates entirely on the argument that hidden decay and

defective materials have caused the deterioration of the walls, which has

ultimately resulted in a substantial impairment of structural integrity amounting

to a covered collapse under *Beach v. Middlesex Mutual Assurance Company*, 205

Conn. 246, 252 (1987). Dkt. 37, at 9-11. Further, Plaintiff argues that the question

of whether the collapse was "sudden and accidental" under the Policy is

ambiguous in the context of collapse coverage, and therefore cannot be decided

on summary judgment. Dkt. 37, at 13. Plaintiff focuses on the collapse argument,

so the Court's analysis will start there.

### 1. Coverage under Additional Protection for Collapse

The Policy does not cover loss consisting of or caused by "[c]ollapse,

except as specifically provided in Section I — Additional Protection." Dkt. 36-4, at

7. The "Additional Protection" for collapse section of the Policy reads:

> We will cover:
>     a) The entire collapse of a covered building structure;
>     b) the entire collapse of part of a covered building structure; and
>     c) direct physical loss to covered property caused by (a) or (b).
>
> For coverage to apply, the collapse . . . must be a sudden and accidental
> direct physical loss caused by one or more of the following:
>     a) a loss we cover under Section I, Coverage C—Personal Property
>         Protection;
>     b) hidden decay of the building structure;
>     c) hidden damage to the building structure caused by insects or

8

vermin;
d) weight of persons, animals, equipment or contents;
e) weight of rain or snow which collects on a roof;
f) defective methods or materials used in construction, repair, remodeling, or renovation.

Collapse does not include settling, cracking, shrinking, bulging or expansion.

Dkt. 36-4, at 15.

Defendant argues that the claimed loss was not caused by a "sudden and accidental" "entire collapse" within the unambiguous terms of the Policy, and, as a result, Defendant did not breach the contract as a matter of law by declining Plaintiff's claim. Dkt. 36-1, at 17, 12. Even further, Defendant argues that the specific exclusion of settling, cracking, shrinking, bulging, or expansion from the term collapse renders Plaintiff's loss outside Policy coverage. Dkt. 36-1, at 22. Plaintiff has a different interpretation of the contract. She argues that the Policy terms are ambiguous and that under the *Beach v. Middlesex Mut. Assurance Co.*, 205 Conn. 246, 252 (1987), definition of collapse, the claimed loss qualifies for coverage. Specifically, Plaintiff argues that "a form of hidden decay" and deterioration that was "the result of improper materials used in [] construction," caused a series of sudden events over time, which led to the cracking pattern and ultimately the substantial impairment of the structural integrity of the Property amounting to a collapse. Dkt. 37, at 10.

In *Beach*, the Connecticut Supreme Court considered the meaning of the term "collapse" in the context of an insurance policy and found it to be ambiguous where not otherwise defined, further concluding that the undefined term could be construed to include coverage for "any substantial impairment of

the structural integrity of a building." *Beach v. Middlesex Mt. Assurance Co.*, 205 Conn. 246, 252 (1987). When construing the term "collapse," the *Beach* Court specifically noted that the insurance company had the opportunity to "define the term to provide for the limited usage it now claims to have intended"—a complete falling in of a structure—emphasizing the ability of parties to modify by contract the meaning of collapse if they so choose. *Beach*, 205 Conn. at 251. "The definition of 'collapse' as 'substantial impairment of structural integrity' in *Beach* is a default rule, not a mandate of public policy." *Agosti v. Merrimack Mut. Fire Ins. Co.*, 279 F. Supp. 3d 370, 379 (D. Conn. 2017).

Importantly, Allstate took the opportunity to limit coverage for "collapse" in the Policy. Defendant argues that the limiting language requiring an "entire collapse" that is "sudden and accidental" and that is not "settling, cracking, shrinking, bulging or expansion" unambiguously places Plaintiff's claimed loss outside the Policy coverage for a collapse. While the Court does not agree that the cracking exclusion bars coverage here, it does agree with Defendant that the entire and sudden collapse requirements unambiguously bar coverage of Plaintiff's claimed loss.

    a. Exclusion of settling, cracking, shrinking, bulging or expansion

Defendant argues that the cracking and expansion which make up Plaintiff's claimed loss are not covered by the additional protection for collapse because the Policy specifically states that collapse does not include such conditions—"Collapse does not include settling, cracking, shrinking, bulging or expansion." Dkt. 36-1, at 22; Dkt. 36-4, at 15. Defendant urges the Court to follow

the analysis in *Manseau*, which found that the "cracking Plaintiffs allege to have occurred falls squarely within" this exclusion. Dkt. 36-1, at 22-23; *Manseau*, 2017 U.S. Dist. LEXIS 140587, at *11.

Plaintiff suggests that the Court should follow the analysis in *Basewicz v. Allstate Ins. Co.*, No. 3:08-cv-1530, 2010 WL 3023882, at *6 (D. Conn. 2010). Dkt. 37 at 12-13. The *Bacewicz* Court followed the lead of the *Beach* Court in finding that this cracking exclusion does not bar a collapse that ultimately results from a covered peril. *Bacewicz*, 2010 WL 3023882, at *6. In *Beach*, the relevant policy language read: "This policy does not insure against loss . . . [u]nder Coverages A and B . . . 1. by settling, cracking, shrinkage, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings . . . unless . . . collapse of a building . . . not otherwise excluded ensues, then this policy shall cover only such ensuing loss." *Beach*, 205 Conn. at 250. The *Beach* Court reasoned that "[b]y its reference to a 'collapse' that 'ensues,' the policy in this case can reasonably be understood to have contemplated coverage for a 'collapse' that follows consequentially from excluded activity." *Id.* With this guidance, and considering the same language at issue in this case, the *Bacewicz* Court held "that a reasonable jury could conclude that such language simply indicates that a crack or bulge, by itself, does not make for a collapse." *Bacewicz*, 2010 WL 3023882, at *6.

This Court reads the Policy differently. The cracking exception language, when read in the full context of the collapse additional protection provision, serves to bar collapse coverage for normal course, expected conditions that will typically arise with an aging structure. Consideration of the enumerated causes

of a covered collapse, as compared to those conditions that do not constitute a collapse under the Policy, leads to this conclusion. The Policy does cover collapses caused by hidden decay; hidden damage by insects or vermin; weight of persons, animals, equipment or contents; weight of rain or snow which collects on a roof; and/or defective methods or materials used in construction, repair, remodeling or renovation. Each of these conditions is atypical, out of the ordinary, and generally not expected by a homeowner to arise. It is not normal course for a structure to be inflicted with vermin or decay, which, while hidden in the walls, eat away at the materials and result in a collapse. In contrast, homeowners can generally expect that a structure will settle to a certain extent after being built, and normal wear and tear of a structure could expectedly lead to cracking or bulging, for instance, as the result of water seepage followed by freezing or infiltration of tree roots into a foundation. As such, the cracking exception in this context can reasonably be understood to exclude from collapse coverage those conditions generally associated with the aging of a structure.

Here, the defective concrete used in constructing Plaintiff's basement walls falls squarely within the covered peril of defective methods or materials used in construction and has resulted in the deterioration and decay of the concrete. This is the kind of atypical and unexpected peril specifically covered by the additional protection for collapse, when a collapse actually results. The fact that these perils presented as cracking and bulging does not convert the condition to something expected to be found in the ordinary course of home ownership. As such, the exclusion language does not bar coverage of Plaintiff's loss.

### b. Entire Collapse

Defendant also argues that Plaintiff's claim fails because the loss does not amount to an "entire collapse" as required by the Policy. Defendant maintains that this Court should follow the conclusion in *Agosti*, which found that "[t]he language 'entire collapse' was drafted specifically to limit coverage to actual collapses, and to exclude imminent collapse or structural impairment." Dkt. 36-1, at 21; *Agosti*, 279 F. Supp. 3d at 379. Defendant further argues that the undisputed facts do not establish that such an "entire collapse" has occurred here. Dkt. 36-1, at 21.

In *Agosti*, the court considered very similar facts and the same Allstate policy language at issue here. Looking to California insurance policy case law also analyzing this Allstate policy language, the *Agosti* Court reasoned that the Allstate policy "is susceptible of only one reasonable interpretation, namely, an actual collapse," meaning an actual falling down or falling into pieces. *Id.* (citing *Jordan v. Allstate Ins. Co.*, 116 Cal. App. 4th 1206, 1221 (2004)). Further, it concluded that "[s]uch explicit language narrowing the scope of collapse coverage—the meaning of which is obvious even to a layperson—renders the collapse clause unambiguous." *Id.*

Plaintiff argues against following *Agosti* because it considered California state court cases that applied California law, which has interpreted the "collapse" coverage in insurance policies in a much more limited way than Connecticut. Instead, Plaintiff suggests that, in light of *Beach*, "entire collapse" "could . . . be reasonably construed to mean that the entire building structure or an entire part of a building structure must be substantially impaired for a 'collapse' to occur." Dkt.

**13**

37 at 27.  The court took such an approach recently in *Maki v. Allstate Insurance Co.*, finding that "[g]iven that 'collapse' left undefined covers substantial impairment of the structure, it follows that the modifier 'entire' could merely indicate that such impairment must be sufficiently comprehensive in scope."  No. 17-cv-01219, 2018 WL 3057729, at *3 (D. Conn. June 20, 2018).

This Court finds the reliance on the *Beach* interpretation of the undefined term "collapse" under very different contract language less persuasive than the analysis under identical policy language in *Agosti*.  Unlike in *Beach*, the term collapse is not unqualified in the Allstate policy.  A covered collapse must be entire, as well as sudden and accidental.  These qualifiers unambiguously evidence Defendant's intent to cover only actual collapses, not merely substantial impairment.[2]  *See Agosti*, 279 F. Supp. 3d at 379.

There is no dispute that an actual collapse has not occurred here.  Plaintiff readily acknowledges that "there was not the kind of catastrophic 'tumbling down' or 'falling down' that one often associates with the word 'collapse.'"  Dkt. 37, at 10.  "The walls have not fallen down or caved in and [] they are supporting the house and retaining the soil outside."  Dkt. 38, at 8.  Therefore, Plaintiff's

---

[2] This Court previously analyzed the Allstate collapse additional protection provision in *Metsack v. Liberty Mut. Fire Ins. Co.*, No. 14-cv-01150, 2017 WL 706599 (D. Conn. Feb. 21, 2017).  In that case, Allstate did not argue that "entire collapse" required something more than substantial impairment of the structural integrity, instead arguing that the condition of the property did not occur suddenly and did not amount to substantial impairment.  Accordingly, this Court found that "the Allstate Policy excludes coverage for their loss irrespective of the definition of the term 'collapse'" "[b]ecause the parties do not dispute that the Metsacks' basement walls deteriorated over time, rather than 'suddenly,' and that the effects of the condition which has compromised the structure was observable to the homeowners many years before the basement walls were opined to be substantially impaired."  *Id.* at *8.  As such, the Court's decision here is consistent with its analysis in *Metsack*.

14

claim does not warrant coverage under the collapse additional protection provision.

### c. Sudden and accidental requirement

Plaintiff's claim further falls short of collapse coverage because the claimed loss was not "sudden and accidental."  The Connecticut Supreme Court has considered the term "sudden" in the context of a pollution exclusion in a commercial general liability policy.  *Buell Indus., Inc. v. Greater New York Mut. Ins. Co.*, 259 Conn. 527, 536 (2002).  In *Buell*, the court "acknowledge[d] that, the word 'sudden' can be used to describe the 'unexpected nature,' as well as 'abrupt onset,' of the event being described."  *Id.*  But the court concluded that, in the context of the phrase "sudden and accidental," because "accidental" already included an element of unexpectedness, "sudden" had to be accorded a temporal element to avoid rendering it mere surplussage.  *Id.* at 540-41.

Plaintiff argues against using the *Buell* definition of sudden because, while the temporal requirement makes sense for injury resulting from pollution, which can occur suddenly, the enumerated perils in the Policy that may lead to a covered collapse cannot occur suddenly.  Dkt. 37, at 21.  Plaintiff cites to *Dalton v. Harleysville Worcester Mutual*, 557 F. 3d 88, 93 (2d Cir. 2009) and *Kelly v. Balboa Ins. Co.*, 897 F. Supp. 2d 1262, 1268 (M.D. Fla. 2012) in arguing that "sudden" is ambiguous in the context of collapse coverage because "[t]he majority of the specifically enumerated perils covered by the 'collapse' provision contemplate damage occurring over a period of time."  Dkt. 37, at 18.

In *Dalton*, the court found that use of the term "sudden" rendered the term "collapse" ambiguous "where the policy in question defines collapse in a manner

15

which expressly includes conditions that occur only slowly." *Dalton*, 557 F. 3d at 93. But unlike in *Dalton*, the policy at issue in this case, while allowing for coverage of a collapse caused by slowly occurring conditions, *specifically requires suddenness* of the collapse. *See Miller v. Allstate Ins. Co.*, 279 F. Supp. 3d 381, 386 (D. Conn. 2017) (distinguishing the analysis in *Dalton* from the Allstate policy language considered here because it "specifies that collapses caused by 'hidden decay' are covered, but only if they are sudden and accidental").

As for *Kelly*, this Court does not agree that the "inclusion of 'sudden' in the definition of LOSS for a policy that covers insect damage creates an ambiguous policy provision." *Kelly*, 897 F. Supp. 2d at 1268. The cause of a collapse may have progressed over time, but it is still very much possible for the collapse itself to happen within a matter of seconds or minutes—suddenly. "That the Policies acknowledge that sudden collapses may result from hidden, gradual processes does not render them ambiguous." *Carlson v. Allstate Ins. Co.*, No. 3:15-cv-01045, 2017 U.S. Dist. LEXIS 159155, at *21 (D. Conn. Sept. 27, 2017).

Plaintiff further argues against imposing a "temporal element" because it is antithetical to the analysis in *Beach*, which reasoned that a collapse need not involve a sudden or catastrophic event because requiring an insured to wait for such an event would be economically wasteful. Dkt. 37, at 15 (citing *Beach*, 205 Conn. at 252-53). But this argument fails to acknowledge the limits of the *Beach* definition—that it is a default definition, which the parties can, and in this case have, defined around, specifically requiring a temporal element as to collapse by including the language "sudden and accidental." *See Carlson*, 2017 U.S. Dist.

LEXIS 159155, at *17 ("Unlike in *Beach* and its progeny, the Policies here unambiguously express an intent to limit coverage to 'sudden and accidental' collapses.  Thus, the alternative definition of collapse formulated in *Beach*—a substantial structural impairment—does not apply here.")

Plaintiff next argues that "[i]mposing a temporal element on the collapse coverage in cases such as this would serve only to render the collapse coverage illusory."  Dkt. 37, at 16.  "Under this construction there can be no loss until a temporal event occurs, at which time the insurer is free to disclaim coverage for awaiting a temporal event."  *Id.* at 17.  Even so, the Court must read an unambiguous term to mean what it plainly says.  The sudden requirement in the Policy is not ambiguous, and the Court must construe it as the plain language dictates.  *See Adams v. Allstate Ins. Co.*, 276 F. Supp. 3d 1, at *6 (D. Conn. 2017) ("[T]he term 'sudden' is not ambiguous and its use does not render the term 'collapse' in the policy ambiguous.  Under the terms of the Policy, a process of hidden decay does not trigger coverage until a sudden collapse occurs.").

The vast majority of courts considering coverage of concrete decay loss under the collapse additional protection provision have consistently followed the logic in *Buell*, ruling in favor of insurance companies based on the requirement that a collapse be "sudden and accidental."  *Andrew v. Allstate Ins. Co.*, No. 3:17-cv-1192, 2018 U.S. Dist. LEXIS 123328, at *12-13 (D. Conn. July 24, 2018); *Lees v. Allstate Ins. Co.*, No. 3:15-cv-1050, 2017 U.S. Dist. LEXIS 196728, at *14-17 (D. Conn. Nov. 30, 2017); *Valls v. Allstate Ins. Co.*, 3:16-cv-01310, 2017 U.S. Dist. LEXIS 158192, at *13 (D. Conn. Sept. 17, 2017); *Clough v. Allstate Ins. Co.*, 279 F. Supp. 3d 387, 392 (D. Conn. 2017); *Manseau*, 2017 U.S. Dist. LEXIS 140587, at *10-

**11***; Miller*, **279 F. Supp. 3d at 385-86;** *Adams*, **276 F. Supp. 3d at \*4-5;** *Carlson*, **2017 U.S. Dist. LEXIS 159155, at \*21-24;** *Metsack v. Liberty Mut. Fire Ins. Co., et al.*, **No. 3:14-cv-01150, 2017 WL 706599, at \*7-8 (D. Conn. Feb. 21, 2017). This Court agrees that the term "sudden" is unambiguous and includes a temporal element in this context.**

**"Because the term 'sudden,' as used in the collapse coverage provision, means temporally abrupt, [Plaintiff] must point to evidence that the loss for which they seek coverage occurred abruptly, and not merely unexpectedly, for it to be a covered collapse."** *Carlson*, **2017 U.S. Dist. LEXIS 159155, at \*21.**

**Here, the parties do not dispute that "the chemical reaction that caused the damage to Carney's home occurs over years and is gradual in nature." Dkt. 37, at 14. And the parties' experts agree that "the condition they observed in Plaintiff's foundation walls are the result of long-term deterioration." Dkt. 36-2, at ¶ 19. Based on this evidence, Defendant argues that because the chemical reaction causing the decay of the basement walls is gradual in nature, the loss was not "sudden," and coverage is unambiguously out of reach for Plaintiff. Dkt. 36-1, at 17.**

**Plaintiff suggests that "this is not as cut and dry as Allstate suggests." Dkt. 37, at 13. Plaintiff attempts to rescue her claim from the "sudden and accidental" requirement for collapse by arguing that "the gradual reaction can cause sudden events throughout the course of the deterioration." Dkt. 37, at 13-14. According to Plaintiff's expert, Mr. Grandpré, building pressure from the reactions leads to "release events" that "likely occur in sudden increments and, over time, result in the widespread map cracking condition."** *Id.* **at 14. In**

addition, Mr. Grandpré believes that some of the other instances of movement in the walls "can fairly be describe as discrete and sudden events as part of the gradual chemical process." *Id.* As such, Plaintiff argues that "a reasonable jury could find that the overall structural condition at the time that Carney submitted her claim to Allstate was the result of a series of sudden events, though ultimately driven by a long term chemical reaction." *Id.*

The Court does not find this convincing. Based on the plain language of the Policy, it is the "collapse" which "must be sudden," not any "release events" that may eventually lead to a collapse. *See Andrew*, 2018 U.S. Dist. LEXIS 123328, at *15 (considering similar facts and the same policy and concluding that the "language makes clear that it is the 'collapse' that must be 'sudden,' not the cause of the collapse"). Plaintiff does not argue or present evidence to suggest that the "fail[ure]" of Plaintiff's basement walls occurred suddenly. Plaintiff's expert, Mr. Grandpré, even testified that he "do[esn't] believe that [the impairment to the basement walls] went from being minor to substantial in any less than five years . . . [b]ecause the chemical process takes time." Dkt. 38-4 at 32:24-33:5. Thus, regardless of the definition of "collapse," no jury could conclude that said collapse occurred suddenly under the facts at hand. As such, Allstate did not breach the insurance policy contract by denying coverage under the collapse additional protection provision.

2. General Policy Coverage

For the same reason Plaintiff's claimed loss fails to satisfy the "sudden and accidental" requirement for coverage under the collapse additional protection provision, it fails to satisfy the general coverage requirement that loss be

"sudden and accidental."[3]  The Policy states: "We will cover sudden and accidental direct physical loss to property described in Coverage A — Dwelling Protection and Coverage B — Other Structures Protection except as limited or excluded in this policy."  Dkt. 36-4 at 7.  This means that only loss that has occurred suddenly and accidentally will receive coverage under the Policy. Plaintiff seeks coverage for concrete deterioration afflicting the basement walls of her home.  There is no dispute that the condition of Plaintiff's basement walls is the product of a gradual long-term process of deterioration caused by a chemical reaction in the concrete.  Dkt. 38 at ¶19 (Plaintiff admitting that the parties' experts "both agree that the conditions they observed in Plaintiff's foundation walls are the result of long-term deterioration"); Dkt. 38-4 at 39:8-16 (Grandpré agreeing that "the reactive process" that resulted in the cracking is "gradual"). Thus, the "sudden and accidental" requirement unambiguously places Plaintiff's claimed concrete deterioration loss outside of the Policy's coverage.

   The Court does not find Plaintiff's invocation of sudden "release events" in an attempt to surmount the "sudden" requirement credible or convincing. Plaintiff's claimed loss isn't a micro-event, or a series of micro-events, it is the gradual deterioration of the basement walls.  *See* Dkt. 38-4 at 63:12-20 (Grandpré agreeing that the "bulging or bowing" and any "sudden incremental changes" were "part of th[e] gradual process").  Even if the Court indulged such an argument, Plaintiff's claim would not be saved because the micro-events would

---

[3] Plaintiff's Opposition Brief does not address coverage under the general policy provisions—"Losses We Cover Under Coverages A and B" and "Losses We Do Not Cover Under Coverages A and B"—presumably recognizing that such a claim would fail.  Given that Plaintiff's claim is not covered by the collapse additional protection, the Court addresses Defendant's arguments as to why Plaintiff's claim fails under the general coverage as well.

unambiguously fall into multiple of the Policy exclusions, including "15. . . . (d) rust or other corrosion, mold, wet or dry rot; . . . (g) settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings" and/or "22. Planning, Construction or Maintenance, meaning faulty, inadequate or defective: . . . (b) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction; (c) materials used in repair, construction, renovation or remodeling; or (d) maintenance; of property whether on or off the residence premises by any person or organization." Dkt. 36-4, at 7-8. Defendant argues that Plaintiff's claimed loss falls into each of these exceptions to coverage. Dkt. 36-1, at 13-15. The Court agrees.

Exclusion 15(d) of the Policy bars coverage of loss caused by "rust or other corrosion." Dkt. 36-4, at 7. Plaintiff explains that the "pattern cracking" was caused by a chemical compound in the concrete, which, once mixed, "began to oxidize (rust) and expand, breaking the bonds of the concrete internally and reducing it to rubble." Dkt. 19, ¶ 9. Both parties' experts agree that exposure to air and water led to the oxidation of the reaction materials and the cracking of the concrete. Dkt. 36-2, ¶ 20; Dkt. 37, at 10 ("the precise reaction at issue is the oxidation of iron sulfide materials"). As such, the plain language of the Policy excludes coverage of the claimed loss.

Exclusion 15(g) bars coverage of "cracking, shrinking, bulging or expansion of pavements, patios, foundations, [or] walls." Dkt. 36-4, at 7. The parties and their experts describe the claimed loss as "cracking" to "walls" of the Property. Dkt. 9 at ¶¶ 6-9; Dkt. 38 at ¶¶ 14, 17. As such, the loss falls under the 15(g) Policy exclusion.

Finally, exclusion 22 bars coverage of "faulty, inadequate, or defective" "materials used in . . . construction." Dkt. 36-4, at 8. Plaintiff explains that "[t]he chemical reaction occurring within the walls of the home" which led to the cracking is "the result of improper materials used in the construction of the basement walls." Dkt. 37, at 10. As Plaintiff further explains, Defendant's expert engineer Mr. Morse-Fortier "agree[s] that the pattern cracking condition is associated with defective materials used in the construction of the basement walls of the home." *Id.* at 10 n. 2. There is no disagreement that "defective materials used in [] construction" led to the claimed loss. The plain and unambiguous language of exclusion 22 therefore prevents coverage.

When the process of deterioration that is causing damage to the Property—which the parties agree is a gradual one—is broken into micro-events, those micro-events land in categories unambiguously excluded from coverage under the Policy. There is no dispute that the failure of the basement walls was gradual, not "sudden," and as such, Defendant is entitled to judgment as a matter of law on Plaintiff's breach of contract claim and summary judgment is GRANTED in favor of the Defendant with respect to Count I.

B. Count III: CUIPA and CUTPA Claims

Plaintiff has claimed that Allstate violated the Connecticut Unfair Insurance Practices Act ("CUIPA"), *Conn. Gen. Stat.* § 38a-816(6)(F) and the Connecticut Unfair Trade Practices Act ("CUTPA"), *Conn. Gen. State.* § 42-110a, *et seq.*, "[b]y failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear as part of its general business practice." Dkt. 19, at ¶ 44-45.

"Where the claim is premised on denial of coverage under an insurance policy and the insurer's interpretation of the policy is correct, there can be no violation of CUIPA/CUTPA."  *Carlson*, 2017 U.S. Dist. LEXIS 159155, at *26 (citing *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 378 (2008)).  Because this Court has concluded that Allstate's interpretation of the Policy excluding coverage of Plaintiff's claimed loss was correct, Plaintiff's CUIPA and CUTPA claim necessarily fails.  As such, summary judgment as to Count II is GRANTED in favor of Defendant.

V.    <u>Conclusion</u>

For the foregoing reasons, Allstate's Motion for Summary Judgment is GRANTED and Counts I and III of Plaintiff's Amended Complaint are DISMISSED. By order dated February 14, 2017 the Court previously dismissed Count II of the three-count Amended Complaint.  Dkt. 19, 34.  There being no remaining counts, the Clerk is directed to close this case.

IT IS SO ORDERED.

*Vanessa Lynne Bryant* Vanessa Bryant
2018.09.20 12:06:51 -04'00'
_____
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: September 20, 2018**